IRENE O'HARE, Plaintiff, *v.* MARY PETERSEN and FRANCIS H. LEGGETT & COMPANY, Defendants.

Municipal Court of New York, Borough of Queens, Fourth District, July 3, 1940.

*Garofalo & Garofalo [Anthony A. Garofalo* of counsel], for the plaintiff.

*Breed, Abbott & Morgan [Malcolm D. Watson* of counsel], for the defendants.

MORRIS, J. The above-entitled action was tried before the court without a jury, the plaintiff's cause of action against the defendant Petersen being upon the theory of a breach of warranty in the sale of shrimp in a glass jar and against the defendant Leggett upon the theory of negligence. At the end of the whole case

the court held that the plaintiff had failed to make out a case of negligence against the defendant Leggett as the proof showed that said defendant was the distributor of the product and not the manufacturer and likewise failed to make out a case of breach of warranty against the defendant Petersen upon the theory that conceding that the substance in the shrimp was " struvite," said substance was not a foreign or deleterious substance so as to make the shrimp unfit for human consumption and not of merchantable quality.

Plaintiff's motion for a new trial is directed solely to the court's decision in so far as it affects the plaintiff's cause of action against the defendant Petersen on the ground that the court's decision was contrary to the evidence and to the law. The plaintiff in this action testified she purchased a jar of wet shrimp from the defendant Mary Petersen and subsequently prepared and ate some of the shrimp and bit into a hard substance with sharp edges similar to small broken pieces of glass and received certain injuries to her mouth. On the trial the plaintiff produced some of the substance she referred to as pieces of glass and from an examination of the substance which was marked in evidence and from the testimony of an expert produced by the defendant there is no question that the substance in the jar was not glass but was a substance which developed in the jar after packing and is known as ammonium magnesium phosphate or struvite, a mineral occurring in white orthorhombic hemimorphic crystals.

The sole question to determine is whether the sale of a product by a storekeeper containing struvite, a crystal which forms in the jar after packing, gives rise to a cause of action pursuant to section 96 of the Personal Property Law. Is shrimp containing struvite of merchantable quality and fit for human consumption? Is struvite a foreign substance? Is it a deleterious substance? The case of *Gimenez* v. *Great A. & P. Tea Co.* (240 App. Div. 238; affd. in part and revd. in part, 264 N. Y. 390) is cited by the plaintiff in support of plaintiff's contention that the court erred in dismissing the complaint and is referred to by the defendant Petersen as supporting said defendant's opposition to plaintiff's motion for an order vacating the decision rendered in favor of that defendant. Neither the Appellate Division in its *per curiam* opinion nor the Court of Appeals in the opinion by Judge POUND states what the deleterious substance was. The Appellate Division opinion, in so far as it refers to the substance complained of, contains the following: " The evidence further justified the finding that the crab meat was not of merchantable quality, and that it was not fit for human consumption because of the presence therein of a

dangerous substance from which ensued the injuries complained of."
Judge POUND, writing the Court of Appeals decision, at page 393
states: " The wife's cause of action seems clearly established.
She bought a can of crab meat from the retailer. Under section
96 of the Personal Property Law (Cons. Laws, ch. 41) she bought
with an implied warranty of fitness." And then at page 395 we
find the only reference to what the substance might be when the
court discusses the question as to whether the husband might,
under the pleadings, sustain a recovery under the Agriculture
and Markets Law and this reference is found in the following
language: " The deleterious ingredient was not added to the canned
crab meat. It was developed in the can after canning. Technically
it did not amount to adulteration under the statute."

It becomes necessary, therefore, in order to throw some light
on what the substance was that was contained in the canned crab
meat, to refer to the printed record of the case on appeal. In
the *Gimenez* case the article purchased was Japanese crab meat
and the basis of the complaint was " that it contained a deleterious
substance other than crab meat." In the bill of particulars plain-
tiff stated she was unable to state what the deleterious substance
was that was contained in the crab meat, that she had eaten Japanese
crab meat before but never saw such articles before and on the
trial testified that on eating the crab meat a hard substance struck
her teeth; that she removed it; that it looked like glass and was the
size of a pea with jagged edges. She showed it to the storekeeper
and he said, " Yes, it looks like glass." Her husband testified
he examined the crab meat and found probably a dozen to fifteen
pieces of what looked like splinters, clouded glass. One doctor
called by the plaintiff testified that the consumption of a " very
hard, gritty substance " in the crab meat was a competent and
producing cause of the pain and that the hard substance he had in
mind, considering the hypothetical question, was a foreign body
and not a natural constituent of crab meat. Another doctor for
the plaintiff testified that in his opinion the consumption of a hard,
gritty substance was a competent and producing cause of irritation.
For the defense we have the testimony of an inspector from the office
of the board of health of the city of New York who noted small
crystals adhering to the crab meat and found they were not glass;
that he crushed them between his teeth and that they disintegrated
in his mouth and entirely disappeared; that the crystals were not
sharp but had edges and he learned since his inspection that crystals
of this kind are found in canned crab meat as a " usual thing."
A chemist in the bureau of food and drugs of the department of
health, city of New York, testifying for the defendant stated he

examined the crystals and found them by a chemical examination to be organic phosphate containing traces of lime ammonia and some organic matter from some other sources; that there was nothing injurious in these crystals and they evidently were composed of constituents which were native to the meat itself. Another witness who qualified as a specialist in foodstuffs designated the crystals as " struvite," about as hard as salt and stated that the chemical elements of these crystals were magnesium ammonium phosphate and that these crystals formed because the meat when packed is heated and the ammonium and phosphorous in the flesh of the crab unite. In the record on appeal may be found the charge of the court to the jury, several portions of which may be of interest. " You are instructed that if you find upon the evidence in this case that the alleged deleterious substance contained in the crab meat was merely a salt known as magnesium ammonium phosphate and was harmless to the average human system you must find a verdict for the defendant." Then again, " You are instructed that if you find upon all the evidence in the case that the alleged injuries for which plaintiff claims to have suffered were not caused by eating a deleterious substance in the crab meat purchased by her, then in that event your verdict must be for the defendant." Neither the Appellate Division nor the Court of Appeals in its opinion makes any reference to any portion of the charge of the court so that it cannot be said that the first charge quoted in this opinion was accepted by the appellate courts and that, therefore, if the alleged deleterious substance was struvite that the plaintiff would have no cause of action. Obviously the last charge quoted leaves to the jury to determine whether or not the injuries complained of were due to the consumption of a deleterious substance on the basis of all the facts.

In seeking to obtain information as to what may be termed a " foreign substance " the new Merriam Webster dictionary (2d ed.) gives the following definition: " Not organically connected or naturally related. A substance occurring in any part of the body or organism where it is not normally found. Usually introduced from without " and " deleterious to hurt, damage, hurtful or destructive, noxious, pernicious."

The Court of Appeals in *Race* v. *Krum* (222 N. Y. 410) signifies what may be considered as an adequate definition of " fit for human consumption " at page 415: " In the sale of provisions for domestic use, the vendor is bound to know that they are sound and wholesome, at his peril. This is a principle, not only salutary but necessary to the preservation of health and life." And again, " So, in regard to the sale of food for  *  *  *  human consumption the

law annexes an implied warranty that the food is not in an unwholesome condition and unfit to be eaten."

In other words, was the condition of the food unfit for consumption at the time it was eaten and was the consumer thereby injured or made ill? And as to merchantable quality, we may quote from *Ryan* v. *Progressive Grocery Stores, Inc.* (255 N. Y. 388, 392): " The nature of the transaction must determine in each instance the rule to be applied. There are times when a warranty of fitness has no relation to a warranty of merchantable quality. This is so, for example, when machinery competently wrought is still inadequate for the use to which the buyer has given notice that it is likely to be applied. There are times on the other hand when the warranties co-exist, in which event a recovery may be found upon either. ' Fitness for a particular purpose may be merely the equivalent of merchantability.' (Williston, Sales, vol. 1, § 225, and cases there cited.) A dual warranty is thus possible for foodstuffs as for anything else." The Court of Appeals in *Ryan* v. *Progressive Grocery Stores, Inc.* (*supra*) held that loaves baked with pins in them are not of merchantable quality.

In the instant case the mouth of the plaintiff was injured by biting on crystals, several of which were of the size of a large pea. It must be conceded that a retailer is responsible to a consumer who purchases food from the retailer, for injuries sustained by the consumer as a result of a deleterious or foreign substance contained in that food. An inference may logically be drawn from the portion of the opinion quoted from the case of *Gimenez* v. *Great A. & P. T. Co.* (*supra*, p. 393), that the Court of Appeals concluded that the substance which developed in the can of crab meat after canning was a deleterious ingredient although not added to the canned crab meat and that the Court of Appeals did not approve of the charge of the trial court to the effect that if the alleged deleterious substance contained in the crab meat was merely a salt known as magnesium ammonium phosphate, the defendant was entitled to a verdict.

This court is, therefore, of the opinion that struvite crystals of the size contained in the glass jar of shrimp purchased by the plaintiff in the instant case was a deleterious substance which not only may cause injury, hurt or damage but actually did cause injury to the plaintiff and was unfit for the particular purpose for which it was sold.

The motion of the plaintiff to vacate the decision rendered in favor of the defendant Mary Petersen dismissing plaintiff's complaint is granted and a new trial is granted of the said action as against the defendant Mary Petersen. New trial set for September 11, 1940.