**Melvin SPENCER, Appellant,**

v.

**NELSON SALES CO., INC., Appellee.**

**No. 50612.**

Court of Appeals of Oklahoma, Division No. 2.

Oct. 7, 1980.

Released for Publication by Order of Court of Appeals Nov. 13, 1980.

Joanna S. Sepkowitz, Guy A. Secor, Oklahoma City, for appellant.

Melvin F. Pierce, Pierce, Couch, Hendrickson, Johnston & Baysinger, Oklahoma City, for appellee.

Ronald R. Hudson, Rhodes, Hieronymus, Holloway & Wilson, Oklahoma City, for nonparty Joseph Hirsch Sportswear Co. on behalf of appellee.

BRIGHTMIRE, Presiding Judge.

The 52–year–old–plaintiff, Melvin Spencer, who first attended welding school in 1942, was doing some arc welding in his garage on a cold day in January 1973. He had on a suit of long quilted insulated underwear· under his cotton overalls. A hot spark evidently penetrated his coveralls and lodged in his underwear. Suddenly the undergarment ignited and fire spread rapidly downward severely burning plaintiff's right leg.

In June 1974 The World War II Air Force veteran brought suit against the retailer of the underwear–Gibson Products Company of Oklahoma City. In December of 1974 plaintiff joined as a defendant[1] the distributor of the underwear, Nelson Sales Company. In January 1976 the distributor cross–petitioned against the alleged manufacturer, Joseph Hirsch Sportswear Company, asserting indemnity against Hirsch in the event plaintiff recovered from distributor Nelson. For the same reason Hirsch in turn brought yet another party into the case, the Beaunit Corporation, which allegedly manufactured one of the three layers of material used to create the underwear.

The statute of limitations had run against whatever claim plaintiff may have had against Hirsch or Beaunit, and prior to pre-trial Gibson was dismissed from the action. With the case in this posture, the trial judge decided to sever from the lawsuit the collateral cross–actions for indemnity by the distributor Nelson against Hirsch and by Hirsch against Beaunit. Thus, at the time of trial in January 1977 there remained in the case only one defendant–the distributor, Nelson Sales.

But then a bizarre and unorthodox thing happened. Pursuant to earlier granted permission, the attorneys for Hirsch and Beaunit showed up at trial, and over the objection of plaintiff, played an adversarial role ostensibly to "protect" their clients in connection with potential "indemnity issues." Incredibly they were allowed to do everything except voir dire the jury. Thus, each attorney for the two nonparties made an opening statement, a closing argument, put on and cross–examined witnesses, and voiced objections at will. And on appeal, one nonparty has filed a separate brief lauding the attorney participation decision as well as arguing the merits–just as though it was a defendant.

The case was submitted to the jury on the theory of manufacturer's products liability. From a judgment on a verdict for the defendant Nelson Sales, plaintiff Spencer appeals saying the verdict resulted from fundamental instructional errors and the adverse effect of the extraordinary lawyer participation.

I

The first and most obvious instructional shortcoming is the absence of a relevant legal definition of the vital term "defective."

In his petition plaintiff alleged that the underwear in question was defective in two ways: (1) it was extraordinary ignitable and flammable; and (2) the garment bore no label warning the user of this dangerous capability, particularly that it was more combustible than cotton or other outer apparel. Such faultiness, he continued, rendered the garment unreasonably dangerous, that is, dangerous to an extent beyond that contemplated by plaintiff–an ordinary consumer. This, the pleader concluded, was causally connected to the severe burns he received.

■ These allegations brought plaintiff within the purview of manufacturer's prod-

---

1. There were other parties in this case who were later dismissed. It is unnecessary to this decision, however, to make further reference to those parties.

ucts liability principles approved in *Kirkland v. General Motors Corp.*, Okl., 521 P.2d 1353 (1974). There the concept published in Restatement (Second) of Torts § 402A (1964) was applied. The basic rule stated in this section is "One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability" for the harm it causes.

Comments accompanying the principal statement of § 402A reveal that the authors considered a product to be defective if the supplier fails to give directions or a warning as to its use or characteristics, if such is required to prevent the product from being unreasonably dangerous to the user.[2]

■ The trial judge appeared to be aware of the Oklahoma Supreme Court's commitment to § 402A because Instruction No. 6–one of four given relating to the subject of manufacturer's products liability–he defined the term "unreasonably dangerous" in almost the exact language of *Kirkland*.[3] And so the instruction is partially correct–save for the utterly unnecessary and argumentative last sentence relating to the "mere possibility" of causation[4]

**2.** *See* Comments *h* and *j*.

**3.** Instruction No. 6 reads in relevant part:
"[T]his lawsuit [is based] upon a theory of law known as Manufacturer's Products Liability.... [T]he law [is that] ... one who ... supplies ... a product in a defective condition which is unreasonably dangerous to the user ... is strictly liable for all harm ... [resulting from] the defect while the product is being used for its intended purpose.

.    .    .    .    .

"By being 'unreasonably dangerous' to the user, as that term is used above, means that the product must be shown to be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.
"In summary of this instruction, you may find the defendant liable to the plaintiff in this lawsuit if you find from the evidence the following facts to exist:
1. That the defendant Nelson Sales Co., Inc., supplied the underwear which was ultimately worn by the plaintiff at the time of his accident and that such underwear contained a defect which made the product unreasonably dangerous to the user;
2. That such defect existed in the product at the time it left the defendant's control; and
3. That such product was the cause of damages to the plaintiff. In this connection, you are instructed that the mere possibility that it might have caused the injury is not enough."

**4.** Similar criticism can be leveled at Instruction No. 5. In that superfluous, and indeed, erroneous defense–slanted charge the judge argued in the negative that: "[T]he mere happening of an accident and injury raises no presumption of defectiveness in the garment involved in the accident, nor does it raise a presumption of the breach by a defendant of its obligations under the theory of Manufacturer's Products Liability."

Besides repeating statements made in at least two other instructions (*See* instructions 4 and 10 below), it clearly turned out to be an attempted adaptation of a stock negligence instruction. "The burden rests," the court continued, "upon the plaintiff who alleges such breach to establish the same by evidence which to your minds seems more probably true than not true. Likewise, the burden of proof is upon such party to show that the breach of such obligation was the proximate cause of the injury and damages sustained by the plaintiff. 'Proximate cause' means that cause which, in natural or probable sequence, brought about the injury complained of."
This instruction, in effect, told the jury that plaintiff had to prove the supplier breached a duty which proximately caused injury to plaintiff. This was misleading. The jury were not to determine whether the defendant breached a duty, but whether the product it marketed was defective as stated in the first paragraph of Instruction No. 6 and numbered paragraph 1 of the repetitive, directional Instruction No. 10–which, incidentally, should have been the first rather than the last of the fragmented liability series.
Instruction No. 10 reads:
"The plaintiff has the burden of proving each of the following propositions:
1. That the defendant Nelson Sales Company supplied the underwear which was ultimately worn by the plaintiff at the time of his accident and that such underwear contained a defect which made the product unreasonably dangerous to the user;
2. That such defect existed in the product at the time it left the defendant's control; and
3. That such product was the proximate cause of the damages to the plaintiff.
"The defendant has the burden of proving the affirmative defense which it has raised,

—so far as abstract principles recited are concerned. It lacks, however, contextual tailoring to the evidence presented and issues raised by plaintiff in order to make it meaningful to those responsible for finding the facts. In performing their factfinding function the jury were told to "find" whether the underwear was "defective"—the central object of their quest. But, how could the jury go about making such a finding without knowing the legal meaning of the critical word "defective" in terms of the presented factual situation? Obviously they could not. This failure of the trial court to adaptively define "defective"—that is, in a way compatible with the pleadings and evidence—operated to deprive plaintiff of having his theory of recovery presented to the jury. As a consequence the trial judge breached his nondelegable duty to properly instruct the jury on a fundamental matter—a default that constituted prejudicial error necessitating a new trial. *Pechacek v. Hightower*, Okl., 269 P.2d 342 (1954).

Perhaps it would be helpful to discuss what definition should have been given. Courts have tended to avoid a stiff or inflexible definition of "defective" and have considered the term pliable and amenable to situational molding in an almost endless variety of product design, function and performance contexts. For example, it has been held that a product, though properly manufactured, is defective if its design is unreasonably dangerous,[5] if it is not fit for the ordinary purposes for which such articles are sold and used,[6] if it fails to perform its intended function safely,[7] if it does not meet reasonable expectations of an ordinary consumer as to its safety,[8] if it is rendered dangerous by failing to perform in a manner which can be reasonably expected in light of its nature and intended use,[9] if the manufacturer uses material which results in an unreasonably dangerous design and a product unsafe for an intended use,[10] if known risks inhere in the product that would lead a reasonable and humane seller to withhold it from the market, if the risks are greater than a reasonable buyer would expect,[11] or if the product does not fulfill a policy assumption that it will serve in normal use without causing injury.[12]

With regard to polio vaccine, the Oklahoma Supreme Court has held that a manufacturer's failure to warn prospective injectees of known risks renders the product defective.[13] A product lacking safety de-

namely, that the plaintiff misused the underwear and that his own misuse was the proximate cause of his accident and injuries.

"If you find from your consideration of all of the evidence that each of the propositions required of the plaintiff has been proved and that the defendant's affirmative defense has not been proved, then your verdict should be for the plaintiff.

"If, on the other hand, you find from your consideration of all of the evidence that any one of the propositions the plaintiff is required to prove has not been proved, or that the defendant's affirmative defense has been proved, then your verdict should be for the defendant."
Instruction No. 4 reads:

"In a civil lawsuit, such as this one, there are requirements as to which party is to prove to you certain things. This is called, 'burden of proof.'

"When I say that a party has the burden of proof on any proposition, or use the expression 'if you find,' or 'if you decide,' I mean you must be persuaded, considering all the evidence in the case, that the proposition on which such party has the burden of proof is more probably true than not true."

**5.** *Union Supply Co. v. Pust*, 196 Colo. 162, 583 P.2d 276 (1978).

**6.** *Manieri v. Volkswagenwerk A. G.*, 151 N.J. Super. 422, 376 A.2d 1317 (1977).

**7.** *Schaffer v. Honeywell, Inc.*, 249 N.W.2d 251 (S.D.1976).

**8.** *Ford Motor Co. v. Matthews*, 291 So.2d 169 (Miss.1974).

**9.** *Krammer v. Edward Hines Lumber Co.*, 16 Ill.App.3d 763, 306 N.E.2d 686 (1974).

**10.** *Bradford v. Bendix–Westinghouse Auto. Air Brake Co.*, 33 Colo.App. 99, 517 P.2d 406 (1973).

**11.** *Welch v. Outboard Marine Corp.*, 481 F.2d 252 (5th Cir. 1973).

**12.** *Snider v. Bob Thibodeau Ford, Inc.*, 42 Mich. App. 708, 202 N.W.2d 727 (1972).

**13.** *Cunningham v. Charles Pfizer & Co.*, Okl., 532 P.2d 1377 (1975). *See also Hiigel v. Gener-*

vices necessary for a reasonably safe use of it is defective.[14] In fact, the terms "dangerous" and "defective" have been treated as nearly synonymous in the text of a long–arm statute,[15] and the words "defective condition" and "unreasonably dangerous" were considered to be "essentially synonymous" in a strict liability food case.[16]

■ Here the evidence is that the particular undergarment worn by plaintiff–not some other similar one–possessed extraordinary ignition and flame characteristics.[17] The user could not be expected to know this. Thus the jury should have been informed that a garment is defective (1) if its ignitability or flammability is extraordinary–that is, it ignites more readily and burns more rapidly and intensely than cotton or other conventional clothing materials–rendering it unreasonably dangerous; or (2) if it bears no label either instructing the user of the undergarment's high ignition and intense flame capability, or warning that because of its quilted design it is more combustible than conventional clothing and that it should not be permitted to come in contact with fire or anything hot.

Once the term defect is defined the explanation of the term unreasonably dangerous made in Instruction No. 6 becomes both meaningful and useful. The jury should have been instructed that if they found the underwear caught fire and burned in the manner plaintiff testified it did, than it was defective and unreasonably dangerous. *Cf. Deffebach v. Lansburgh & Bro.,* 150 F.2d 591 (D.C.Cir.), *cert. denied,* 326 U.S. 772, 66

S.Ct. 177, 90 L.Ed. 466 (1945) (though an implied warranty case, the principles are applicable to strict liability).

## II

■ The other instructional error had to do with the defense of product misuse. The jurors were told in Instruction No. 7 that "In this case the defendant as one of its defenses contends that the plaintiff was using the underwear in an abnormal manner not intended by the defendant. If you find from all of the evidence in this case that the defendant has sustained such showing of misuse on the part of the plaintiff, then your verdict should be in favor of the defendant." [18]

This instruction misguided the jury and should not have been given. There is no evidence that plaintiff was using subject clothing in any manner or for any purpose other than as an undergarment to keep himself warm. It is not disputed that he was wearing the clothing in a perfectly normal manner and in a way intended by its supplier. The judicial implication that he was not, and the granting to the jury authority to find he was not, was improper. What the defendant contends is that proper precaution dictated plaintiff wear leather coveralls to retard penetration of the sparks and since he did not, his malfeasance–an act of negligence–contributed to the cause of his injuries. The distinction between "use for an abnormal purpose and use for a proper purpose but in a careless manner [contributory negligence]" was recognized

---

*al Motors Corp.,* 190 Colo. 57, 544 P.2d 983 (1975).

**14.** *Pike v. Frank G. Hough Co.,* 2 Cal.3d 465, 467 P.2d 229, 85 Cal.Rptr. 629 (1970).

**15.** *Jacobsen v. Ducommun, Inc.,* 87 Nev. 240, 484 P.2d 1095 (1971).

**16.** *Matthews v. Campbell Soup Co.,* 380 F.Supp. 1061 (S.D.Tex.1974).

**17.** According to Frumer and Friedman most fabrics are combustible. "There are, however, great differences in the ease of ignition, rate of burning, and flame intensity for different fibers and fabrics. Most people are not aware of these great differences which exist in fabric

flammability." L. Frumer & M. Friedman, 3 Products Liability § 36.02[1][b] (1980).

**18.** And not only was the plaintiff's use of the underwear abnormal, argues defendant, but he offered no proof that the supplier should have foreseen this. The short answer to this contention is that the use was not abnormal and, if it were, the burden rests upon the defendant to prove the defense and not on plaintiff to disprove it. If, as defendant says, foreseeability (by manufacturer or supplier of potential abnormal use) is a test for determining the supplier's liability, then to succeed with its defense the defendant (not plaintiff) would have to prove the abnormal use was not foreseeable.

in *Fields v. Volkswagen of America, Inc.*, Okl., 555 P.2d 48 (1976).[19] And *Kirkland* carefully explained that defenses indigenous to negligence actions are not applicable in manufacturer's products liability lawsuits.

### III

■ Finally, allowing the severed corporations full participation as though each remained defendants in the case was a gross error. There is no doubt that triple–teaming the plaintiff wrought an oppressive and detrimental impact on his attempt to present his case. To judicially condone such unorthodox procedure is to open the door to the full trial participation in any given case of all persons or entities whose interest can be affected by its outcome. For example, such a nonparty participation rule would allow a severed defendant in a capital criminal conspiracy case to nevertheless insist on a right of full defensive participation in his co–defendant's trial on the ground that a "win" for the first defendant tried might "render moot" the charge against the nontried defendant.

Nor is it any answer to say positive evidence of prejudice has not been shown. When the traditional criteria for a fair trial have been so enormously offended in such a vital area, prejudice can and ought to be presumed. Granted, substance should not be a slave to form, but neither should it be permitted to be lost in a fog of formlessness.

Any lawyer with even a little courtroom experience knows that the more participating counsel he has opposing him the more difficulty he faces in presenting his case or defense. Unnecessary lawyer participation is time–consuming, breeds confusion, and raises the risk of introducing extraneous information and misinformation to the jury. In deference to this elemental fact, it is not unusual–when a party has more than one lawyer–to limit attorney participation by requiring a chief counsel to handle the trial. Restrictions are also usually placed on representatives of multiple parties in regard to a given issue (as distinguished from different issues affecting each of two or more defendants).

Of course, a fair and impartial trial should not be an end in itself, but merely a means of achieving the ultimate objective–justice. We are not satisfied that justice was achieved in this case and one reason may well be the unconventional attorney participation.

The cause is reversed and remanded for a new trial.

BACON, J., concurs.

---

**19.** Moreover, the writer, who has done quite a bit of arc and acetylene welding as a hobby, doubts that wearing the undergarment without leather outer clothing was negligent. He has several spark holes in socks and trousers that could have been prevented by wearing a leather cover, but he never has had any of his clothing, much less undergarments, react to welding sparks as plaintiff's did in this case. This experience comports with that of the witness who testified at trial–a veteran welder–who said he never has worn a leather cover and would not expect his clothing to catch on fire.